929 A.2d 531

**Carol GAZUNIS, et al.**

**v.**

**Amelia R. FOSTER, et vir.**

**No. 120, Sept. Term, 2006.**

Court of Appeals of Maryland.

Aug. 1, 2007.

542

Patricia P. Via, Chief, Division of Litigation (Marc P. Hansen, Acting County Atty., Sharon V. Burrell, Associate County Atty., on brief), for petitioners/cross-respondents.

Henry E. Weil (Belli, Weil & Grozbean, P.C., on brief), Rockville, for respondents/cross-petitioners.

Argued before BELL, C.J., RAKER, CATHELL *, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER (Retired, Specially Assigned), JJ.

GREENE, J.

This matter arises from a civil action filed in the Circuit Court for Montgomery County by Amelia Foster and her husband, David Foster, against Carol Gazunis and the Montgomery County Board of Education ("the Board").[1] Ms. Foster brought a claim for defamation against Ms. Gazunis and claims for wrongful demotion, termination and breach of contract against the Board. Mr. and Mrs. Foster sought damages for loss of consortium from both Ms. Gazunis and the Board.

Petitioners ask us to determine whether the Circuit Court committed reversible error by permitting hearsay testimony to establish the publication element of Ms. Foster's defamation claim. Both Petitioners and Respondents ask us to decide whether Ms. Foster failed to exhaust her contractual remedies under the collective bargaining agreement before the resolution of the issues in the Circuit Court, and, if so, whether the Circuit Court erred in reaching those issues. In addition, they ask us to examine whether the Board was obligated to arbitrate Ms. Foster's grievance after she waived arbitration and later sought to revive her request for arbitration. The

---

* Cathell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Throughout this opinion, we shall sometimes refer to Carol Gazunis and the Board as "Petitioners" and to th c Fosters as "Respondents."

parties disagree as to whether the trial court erred by granting Petitioners' motion to alter or amend the verdict, thereby absolving Carol Gazunis of liability, after the jury returned a verdict in favor of Ms. Foster on the claim of defamation. Lastly, Petitioners and Respondents request that we analyze whether the Board was entitled to immunity pursuant to Md.Code (1974, 2006 Repl.Vol.), § 5–518(b) of the Courts and Judicial Proceedings Article,[2] and, if so, whether the trial court was correct to enter judgment in the amount of $100,000 against the Board after the jury returned a special verdict for $285,000 against Ms. Gazunis or the Board.[3]

We shall hold that the hearsay issue is not properly before this Court. In addition, we shall hold that Ms. Foster voluntarily waived her right to arbitration and that the Board was under no obligation to revive the arbitration proceedings after the waiver and after the time limits had passed. Thus, Ms. Foster had to exhaust her contractual remedies before she was entitled to adjudicate her claims for wrongful demotion, termination and breach of contract. Therefore, the Circuit Court erred in allowing the jury to determine those issues. We shall therefore reverse the judgment of the intermediate appellate court. In addition, we shall hold that the intermediate appellate court erred in not reaching the other issues that the parties presented to it on appeal and shall remand the case to that court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

We adopt the underlying facts as set forth by the Court of Special Appeals in its unreported opinion. The court stated:

---

**2.** Section 5–518(b), entitled *"Claims for more than $100,000,"* states:

A county board of education, described under Title 4, Subtitle 1 of the Education Article, may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy, or, if self-insured or a member of a pool described under § 4–105(c)(1)(ii) of the Education Article, above $100,000.

**3.** The verdict sheet directed the jury to determine, in the disjunctive, the amount of damages it was awarding in favor of Ms. Foster. Neither party has raised the issue of whether the verdict sheet was incorrectly written. Therefore, the issue is not properly before us.

Since she began working for the Board in 1987, Am[elia] Foster worked her way up from school bus driver to User Support Specialist I. In that position, she was responsible for all of the computers at Albert Einstein High School (Einstein), and earned an annual salary of $60,500. By September 2002, she had been in that job for five years. Foster reported directly to the Einstein principal, Jani[s] Mills.

The computers and networks within the entire school system were supervised by the Board's Office of Global Access Technology (OGAT). Carol Gazunis was a supervisor in OGAT and classified as a User Support Specialist II. Her son Chris Gazunis also worked at OGAT, performing on-site computer services for county schools.

In June 2002, a new server arrived at Einstein. Foster requested assistance from OGAT in setting it up. OGAT sent John Manchester and Chris Gazunis out to the job. While they were working, Foster noticed that occasionally they would shut the server down by pushing the power button, as opposed to typing in the word "Down," as Foster believed was the proper way. When Foster pointed this out to them, they allegedly told her they could not wait for it to shut down properly.

By Thursday, September 22, 2002, there had been recurrent problems with the server. On that day, principal Mills called a staff meeting. Carol Gazunis explained that the server had gone down as a result of a power surge. After the meeting, Foster returned to Mills' office to advise her in private that she believed the server went down because Manchester and Chris Gazunis had been shutting it down improperly. Mills asked Carol Gazunis to return to her office and then asked Foster to repeat that allegation. Gazunis became upset and responded that using the power button to shut down the server would not hurt anything.

Shortly after this encounter, Gazunis came to Foster's office. She was very angry and threatened Foster that she would have her fired for complaining to Mills about her son and would ruin Foster's reputation by telling everyone at

OGAT that the network was a big mess. According to Foster, Gazunis said, "One of us is going down, and it's not going to be me."

The next day, Foster's password had been changed without her knowledge, apparently by Chris Gazunis. She was later given a new password that did not allow her to access any of her applications or files.

On Monday, September 30, students and staff had more log-in problems. That afternoon, Mills called Foster into her office. According to Foster, Mills was upset and told her that Carol Gazunis had told her that Foster purposefully sabotaged the computer network. Foster denied doing so.

Shortly after that conversation, Mills relieved Foster of all her computer responsibilities, instructing her to turn in her keys and report to the office to do [X]eroxing. Foster continued in those duties for approximately six weeks. On November 11, she was placed on administrative leave. On January 2, 2003, she was demoted [4] from SS–1 Grade 20 to a Special Education Instructor, Grade 11, at a salary of $20,000 (a salary reduction of $40,500), a position in which she escorted handicapped students to the restroom.

Foster took extended sick leave, but was released for duty in June 2003. She did not receive a work assignment

---

4. The Board explains, in its brief, that it conducted an investigation to determine what was causing the log-in problems, shortly after Ms. Mills relieved Ms. Foster of her regular duties. The Board explains further that it determined that Ms. Foster was involved in causing the problems, and gave her an opportunity to explain her actions to its investigator. The Board states that, as a result of the investigation, it concluded that Ms. Foster was involved in the inappropriate and improper use of the computer system. On January 2, 2003, the Board demoted Ms. Foster. The Chief Operating Officer of the Montgomery County Public Schools informed Ms. Foster, in writing, of the Board's decision to demote her. The letter explained that Ms. Foster was being reprimanded and demoted because the investigation into her conduct provided compelling evidence that she knowingly disabled the computer system.

for the start of the 2003 school year by September. She found other employment, paying $50,000 per year.[5]

Ms. Foster timely filed two grievances relating to her demotion. She also began the administrative review process in accordance with the policies and regulations of the Montgomery County Public Schools and the union contract between her employer, the Board, and the Montgomery County Council of Supporting Services Employees (MCCSSE). As explained in more detail below, the contractual grievance process involves four steps. The first three steps involve the employee filing complaints with various individuals and the fourth step consists of arbitration of the grievance. The employee is entitled to stop the process at any point, or may proceed to subsequent steps if unsatisfied with the outcome of the previous step.

In this case, the union pursued Ms. Foster's action through step three and initiated arbitration under the fourth step at her request. Ms. Foster subsequently withdrew her request for arbitration, and, on September 23, 2003, she and her husband, David Foster, filed a civil action in the Circuit Court for Montgomery County against Petitioners. Ms. Foster alleged defamation (Count 1) against Ms. Gazunis, and wrongful demotion and termination (Count 2), and breach of contract (Count 4) against the Board. Mr. and Mrs. Foster alleged loss of consortium (Count 3) against Ms. Gazunis and the Board.[6]

---

**5.** According to Petitioners, Ms. Foster was eventually notified of her assignment for the 2003–2004 school year, but declined the assignment as she had taken a job outside of the school system. The Board, thereafter, notified Ms. Foster that her decision not to resume working for the Board was considered a resignation.

**6.** These counts, as listed, appeared in Respondents' second amended complaint, filed on June 29, 2004. In their original complaint, Ms. Foster alleged defamation (Count 1), and wrongful discharge (Count 2), and Mr. and Mrs. Foster alleged loss of consortium (Count 3). Respondents also filed an amended complaint on January 20, 2004, in which Ms. Foster alleged defamation (Count 1), and wrongful demotion and termination (Count 2) and Mr. and Mrs. Foster alleged loss of consor-

After discovery, Petitioners filed a motion for summary judgment on all counts. One of the contentions in their motion was that Ms. Foster had failed to exhaust the remedies provided for in the collective bargaining agreement and should therefore be precluded from bringing claims for wrongful demotion, termination and breach of contract. On October 7, 2003, the Circuit Court denied the motion for summary judgment as to the defamation count and stayed the remaining counts, pending completion of arbitration as required by the collective bargaining agreement. Ms. Foster thereafter asked the Board, in writing, to revive the arbitration proceedings for the grievance that she had previously withdrawn. The Board responded by sending a letter to the union representative advising the representative that Ms. Foster had voluntarily requested that her grievance be withdrawn and that, based on her request, the Board canceled the arbitration.

Prior to the start of trial, Respondents filed a "Motion for Consolidation," asking the court to consolidate for trial all four counts on the ground that the Board would not agree to arbitration. Petitioners filed a motion titled "Opposition to Plaintiffs' Motion for Consolidation/Defendants' Motion to Lift Stay and for Summary Judgment," requesting dismissal of the wrongful demotion, termination and breach of contract claims, on the ground that Ms. Foster had failed to exhaust the remedies provided in the collective bargaining agreement.[7]

---

tium (Count 3). Ms. Foster did not add the breach of contract claim until she and her husband filed their second amended complaint.

**7.** Petitioners did not raise the question of failure to invoke and exhaust statutory administrative remedies in the trial court. There appears to be a parallel statutory administrative remedy under Md.Code (1978, 2006 Repl.Vol.), § 4–205(c) of the Education Article. *See Bd. of Educ. for Dorchester County v. Hubbard,* 305 Md. 774, 789, 506 A.2d 625, 632 (1986) (applying § 4–205 of the Education Article as a basis for review of the decisions of the county superintendent of schools); *Compare Arroyo v. Bd. of Educ. of Howard County,* 381 Md. 646, 655–57, 851 A.2d 576, 581–83 (2004) (applying § 6–202 of the Education Article as a basis to review the decisions of the county superintendent of schools). As neither side argued whether or how that remedy could have been utilized, we do not address Ms. Foster's failure to invoke and exhaust her statutory administrative remedies.

The court granted Respondents' motion and ordered consolidation of all four counts for trial. Prior to any testimony in the case, Petitioners' counsel made an oral motion *in limine* to exclude the anticipated testimony of Ms. Foster pertaining to the defamation claim on the ground that the testimony was inadmissable hearsay. The Circuit Court denied the motion.

Petitioners moved for judgment on Counts 1 (Defamation) and 4 (Breach of Contract) at the close of Respondents' case and again at the close of all the evidence.[8] The court denied the motion. The jury returned a verdict in favor of Ms. Foster on the defamation and wrongful demotion claims and in favor of Mr. and Mrs. Foster on their loss of consortium claim.[9] The jury awarded Ms. Foster $35,000 for past loss of earnings, $200,000 in non-economic damages for emotional distress, and awarded the Fosters $ 50,000 on their loss of consortium claim, bringing the total damage verdict to $285,000. The verdict sheet appeared as follows:

(1) On the claim for Defamation, for whom do you find?

Plaintiff, Amelia Foster <u>X</u>

Defendant, Carol Gazunis ____

If you have found in favor of the Defendant, proceed to Question 3.

If you have found in favor of the Plaintiff, proceed to Question 2.

(2) Do you find that Defendant, Carol Gazunis, had actual knowledge of the falsity of the defamatory statement that she made to Janis Mills regarding Amelia Foster?

Yes ____

No <u>X</u>

---

**8.** The Board orally withdrew the motion for judgment as to Count 4.

**9.** The jury determined that Ms. Foster was not wrongfully terminated. In their second amended complaint, Respondents sued for breach of contract (Count 4) on the grounds that Ms. Foster "was terminated for reasons other than proper cause." In answering that Ms. Foster was not wrongfully constructively terminated, the jury, in effect, decided Count 4 in favor of the Board.

(3) Do you find that the Montgomery County Board of Education wrongfully demoted Amelia Foster?

Yes X

No ____

(4) Do you find that the Montgomery County Board of Education wrongfully constructively terminated Amelia Foster?

Yes ____

No X

If you have found for Plaintiff on any of Questions 1, 3, or 4, proceed to Question 5.

(5) What amount of damages do you award Amelia Foster against the Montgomery County Board of Education or Carol Gazunis[?]

Past Medical Expenses $0

Past Loss of Earnings $35,000

Non–Economic Damages $200,000

(Emotional Distress)

(6) What amount of damages do you award to Amelia Foster and David Foster against the Montgomery County Board of Education or Carol Gazunis for Loss of Consortium? $50,000

On March 10, Petitioners filed a motion to alter or amend the verdict, to the extent that it exceeded the $100,000 statutory cap on damage claims, pursuant to Md.Code (1974, 2006 Repl.Vol.), § 5–518(b) of the Courts and Judicial Proceedings Article. Petitioners also argued, in that motion, that Ms. Gazunis was not personally liable for damages resulting from her tortious acts, because § 5–518(e) o f the Courts and Judicial Proceedings Article [10] negated her liability. The court

---

**10.** Md.Code (1974, 2006 Repl.Vol.) § 5–518(e), entitled *"Employees,"* states:

A county board employee acting within the scope of employment, without malice and gross negligence, is not personally liable for damages resulting from a tortious act or omission for which a limitation of liability is provided for the county board under subsec-

held a hearing on the motion on April 6, 2005. On April 7,[11] the court reduced the damage award to $100,000 against the Board alone, explaining that, as a matter of law, § 5–518(e) of the Courts and Judicial Proceedings Article negated Carol Gazunis's personal liability. On April 15, 2005, the trial court entered its judgment against the Board in favor of Amelia Foster for $85,750 and in favor of Amelia and David Foster for $14,250.

Respondents filed a motion to alter or amend the judgment, which the court denied. Thereafter, they appealed to the Court of Special Appeals, arguing that the trial court had erroneously granted a JNOV[12] in favor of Carol Gazunis and that the court erred in finding that the Board was entitled to the immunity set forth in § 5–518(b), which capped the damages at $100,000. Petitioners cross-appealed, arguing that the trial court erred in permitting hearsay testimony that provided an essential element of the defamation claim and that the court erred in permitting the jury to consider the wrongful demotion claim when Ms. Foster had failed to exhaust the remedies provided in the collective bargaining agreement.

The Court of Special Appeals addressed only the issue of whether Ms. Foster had exhausted her remedies under the collective bargaining agreement and concluded that even though she waived her right to arbitrate, "the wrongful demotion and breach of contract claims may be arbitrable if the Board did not waive its right to arbitrate." The intermediate appellate court vacated the Circuit Court's judgment and remanded the case to that court for a determination of whether the Board waived its right to arbitrate.

---

tion (b) of this section, including damages that exceed the limitation on the county board's liability.

11. The court entered this order on April 15, 2005.

12. The court negated Ms. Gazunis's liability "[u]pon consideration of Defendant's Motion to Alter or Amend Judgment to set aside Statutory Limitation on Damages and supporting Memorandum." It never stated, as Respondents suggest, that it was granting a JNOV in favor of Ms. Gazunis.

On November 21, 2006, Petitioners filed a petition for writ of certiorari with this Court,[13] and on December 4, 2006, Respondents filed both a petition for writ of certiorari,[14] and an answer to Ms. Gazunis and the Board's petition for writ of certiorari. On December 18, 2006, Petitioners filed an answer to the Fosters' petition for writ of certiorari. We granted both petitions for writ of certiorari.[15] *Gazunis v. Foster,* 396 Md. 524, 914 A.2d 768 (2007).

## DISCUSSION

### *Hearsay Testimony and the Claim for Defamation*

█ We note first that the issue of whether the trial court erred in permitting hearsay testimony to establish the publication element of defamation is not properly before this Court.

---

**13.** Petitioners presented the following questions in their petition for writ of certiorari:

1. Does an employer subject to a collective bargaining agreement have an obligation to arbitrate an employee's grievance where the employee withdrew her request for arbitration and later sought to revive her request after the time to invoke arbitration had expired?
2. Is an employee who is subject to a collective bargaining agreement required to exhaust contractual and administrative remedies set forth in the agreement prior to bringing a lawsuit on a claim that is covered by the agreement?

**14.** Respondents presented the following questions in their petition for writ of certiorari:

1. Did the lower court err in granting judgment notwithstanding the verdict in favor of Carol Gazunis pursuant to § 5–518(e) Cts. & Jud. Proc. where the jury's verdict was in favor of the Fosters on the claim of defamation?
2. Did the lower court err in its finding that the Defendant, Board of Education of Montgomery County was entitled to the immunity provided by § 5–518(b) Cts. & Jud. Proc. Article, Annotated Code of Maryland because it's wrongful demotion of Amelia Foster was contractual and not tortious.
3. Did the lower court err in entering judgment for $100,000.00 against the Montgomery County Board of Education when the verdict of the jury was for $285,000.00?

**15.** For purposes of these proceedings, we are treating Carol Gazunis and the Board as Petitioners and Amelia and David Foster as Respondents, because Carol Gazunis and the Board filed their petition first, and the Fosters filed their petition second.

Petitioners did not raise the hearsay issue in their petition for writ of certiorari—as stated supra, they asked only that this Court address whether an employer must arbitrate an employee's grievance after the employee has waived arbitration and the time limits have passed and also whether an employee who is subject to a collective bargaining agreement must exhaust his or her remedies under that agreement before proceeding with a lawsuit in court. Petitioners first raised the hearsay issue in their answer to Respondents' petition for writ of certiorari. They stated:

This Court should deny the petition for writ of certiorari that is based on issues not decided by the Court of Special Appeals. Alternatively, if this Court grants certiorari, it should review all of the issues presented to the Court of Special Appeals.

More specifically, through the vehicle of an answer to the Fosters' petition for writ of certiorari, Carol Gazunis and the Board asked us to decide whether the trial court erred in permitting hearsay testimony to prove the publication element of defamation.[16] Maryland Rule 8–131(b) provides, in pertinent part:

Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals.

*See also Wynn v. State,* 351 Md. 307, 320, 718 A.2d 588, 594 (1998) (explaining that this Court generally does not address any issue that was not raised in a petition for writ of certiorari or cross-petition granted by the Court).

---

**16.** Petitioners, in their answer, also asked us to address whether the trial court erred in sending the wrongful demotion claim to the jury even though Ms. Foster failed to first arbitrate her claims in accordance with the collective bargaining agreement. This issue is properly before this Court because Petitioners also raised the collective bargaining agreement issue in their petition for writ of certiorari.

■ Moreover, Carol Gazunis and the Board failed to address the hearsay issue in their brief filed in this Court. Petitioners addressed only the collective bargaining issue in their brief, arguing:

An employer subject to a collective bargaining agreement has no obligation to arbitrate an employee's grievance where the employee withdrew her request for arbitration and later sought to revive her request after the time to invoke arbitration had expired.

Respondents, in their brief, addressed the collective bargaining issue and also addressed the issues originally presented in their petition for writ of certiorari. Petitioners, in their reply brief, then discussed the hearsay issue. In accordance with the decisional law of this Court, "a reply brief should ordinarily be confined to responding to the points and issues raised in the appellee's brief." *Ritchie v. Donnelly*, 324 Md. 344, 375, 597 A.2d 432, 447 (1991). *See also Strauss v. Strauss*, 101 Md.App. 490, 509 n. 4, 647 A.2d 818, 828 n. 4 (1994) (stating that "the scope of a reply brief is limited to the points raised in appellee's brief, which, in turn, address[es] the issues originally raised by appellant. . . . A reply brief cannot be used as a tool to inject new arguments"); *Fed. Land Bank v. Esham*, 43 Md.App. 446, 459, 406 A.2d 928, 936 (1979) (explaining that "[t]he function of a reply brief is limited. The appellant has the opportunity and duty to use the opening salvo of his original brief to state and argue clearly each point of his appeal. . . . the reply brief must be limited to responding to the points and issues raised in the appellee's brief"). Accordingly, appellate courts ordinarily do not consider issues that are raised for the first time in a party's reply brief. *See Jones v. State*, 379 Md. 704, 713, 843 A.2d 778, 783 (2004) (explaining that "the State did not raise the argument in its opening brief on appeal, subjecting it to the rule that an appellate court ordinarily will not consider an issue raised for the first time in a reply brief"). We note that, notwithstanding the general rule, appellate courts have the discretion to hear such issues.[17]

---

17. *See Fearnow v. Chesapeake & Potomac Tel. Co.*, 342 Md. 363, 384, 676 A.2d 65, 75 (1996) (explaining that appellate courts retain the

In this case, after Petitioners raised the hearsay issue in their reply brief, Respondents filed a motion to strike the hearsay issue from this case. Petitioners filed an opposition to the motion. This Court deferred action on the motion pending oral argument. At oral argument, both parties addressed the procedural question of whether this Court should reach the hearsay issue but did not address the merits of the hearsay argument. As a result, if we decide the hearsay issue on the merits, we will have heard only Petitioners' arguments on the issue. While this Court retains the discretion to hear issues raised only in a reply brief, we see no reason to reach the merits of the hearsay issue and unnecessarily prejudice Respondents.

█ The hearsay issue was properly raised in the Court of Special Appeals and both parties briefed the issue before that court. Because of the way the intermediate appellate court decided the case, it did not address that issue, as well as several others. We therefore remand the case to that court for consideration of the issues [18] not addressed in its

---

discretion to consider arguments raised for the first time in a reply brief but that they do not abuse their discretion in refusing to do so).

**18.** The Fosters presented the following questions in their brief to the Court of Special Appeals:

1. Did the lower court err in granting judgment notwithstanding the verdict in favor of Carol Gazunis against Amelia R. Foster and David Foster pursuant to § 5–518(e) [of the Courts and Judicial Proceedings Article] where the jury's verdict was in favor of the Fosters on the claim of defamation[?]

2. Did the lower court err in its finding that the Defendant, Board of Education of Montgomery County was entitled to immunity provided by § 5–518(b) [of the Courts and Judicial Proceedings Article] because its wrongful demotion of Amelia Foster was contractual and not tortious[?]

Carol Gazunis and the Board presented the following questions in their brief to the Court of Special Appeals:

1. Did the [C]ircuit [C]ourt commit reversible error by permitting hearsay testimony to establish an essential element of the defamation claim?

2. Did the [C]ircuit [C]ourt err in permitting the jury to consider the wrongful demotion claim where Ms. Foster failed to exhaust her administrative remedies?

opinion.[19]    Accordingly, we grant Respondents' motion to strike the hearsay issue raised in this Court.

Because we are remanding the case to the Court of Special Appeals as to the defamation issue, we need not address the parties' issues concerning the Circuit Court's negation of Carol Gazunis's liability[20] in accordance with Md.Code (1974,

---

3. Did the [C]ircuit [C]ourt correctly limit the judgment to the statutory cap of $100,000.00 and enter judgment solely against the Board?

In addressing these issues, the intermediate appellate court will also have to address various sub-issues. For example, in determining the propriety of the defamation verdict, the court will need to decide whether the record supports a finding that Ms. Gazunis acted within the scope of her employment, without malice and gross negligence, and whether the court or jury should have made that determination in order to absolve Ms. Gazunis of liability, in accordance with Md.Code (1974, 2006 Repl.Vol.), § 5–518(e) of the Courts and Judicial Proceedings Article. Moreover, in determining whether the trial court was correct to limit the Board's liability to $100,000, the Court of Special Appeals also will have to determine, if it concludes that (1974, 2006 Repl.Vol.), § 5–518(b) of the Courts and Judicial Proceedings Article applies, whether the Board was self-insured or a member of a pool described under Md.Code (1978, 2006 Repl.Vol.), § 4–105(c)(1)(ii) of the Education Article, such that $100,000 was not an appropriate limitation. *See* Md.Code (1974, 2006 Repl.Vol.), § 5–518(b) of the Courts and Judicial Proceedings Article (explaining that the cap on damages for purposes of sovereign immunity is $100,000 for Boards that are self-insured or members of certain pools).

**19.**   Our decision to remand to the intermediate appellate court for consideration of undecided issues is consistent with our prior decisions. *See, e.g. Laznovsky v. Laznovsky,* 357 Md. 586, 621–22, 745 A.2d 1054, 1073 (2000) (stating that "[i]t is necessary to remand the case to the Court of Special Appeals for a consideration of the issues. . . . presented to it, but not addressed in its opinion"); *Moodie v. Santoni,* 292 Md. 582, 441 A.2d 323 (1982) (reversing the judgment of the Court of Special Appeals and remanding to that court for the consideration of undecided issues). Similarly, in *Wagner v. Doehring,* 315 Md. 97, 108, 553 A.2d 684, 689 (1989), we stated:

Because of the way it decided the case, the Court of Special Appeals did not address the issue of whether the trial court was correct in holding that as a matter of law the Wagners' conduct was not wanton or willful although that issue had been raised before it. We remand to that court for it to determine that issue, and any other issue properly before the Court of Special Appeals.

**20.**   As explained *supra,* after the jury returned the verdict against Petitioners, they filed a motion to alter or amend the verdict to the

2006 Repl.Vol.), § 5–518(e) of the Courts and Judicial Proceedings Article. Similarly, we need not reach the issue of whether the Circuit Court was correct to limit the Board's damages to $100,000, pursuant to Md.Code (1974, 2006 Repl.Vol.), § 5–518(b) of the Courts and Judicial Proceedings Article.[21] The need to address these issues will depend upon the intermediate appellate court's decision as to the hearsay issue.[22]

### *The Collective Bargaining Agreement and the Claims for Wrongful Demotion and Termination and Breach of Contract*

The collective bargaining agreement, in this case, begins with an informal grievance procedure and then sets forth four specific steps of that process. The agreement exists between the Montgomery County Council of Supporting Services Employees and the Board, for the benefit of its employees. Neither party disputes that Amelia Foster was covered by the

---

extent that it exceeded the $100,000 statutory cap on damages. In response, the court altered the jury's verdict from $285,000 against Carol Gazunis or the Board, and reduced it to $100,000 and entered judgment against the Board alone, explaining that § 5–518(e) of the Courts and Judicial Proceedings Article negated Carol Gazunis's personal liability. Petitioners contend that the trial court had the authority to negate Carol Gazunis's liability in this manner. Respondents disagree.

21. Respondents aver that the trial court erred in finding that the Board was entitled to the protection of Md.Code (1974, 2006 Repl.Vol.), § 5–518(b) of the Courts and Judicial Proceedings Article, because the underlying claims were contractual, and the statute applies to torts. Petitioners argue, however, that the court was correct to apply § 5–518(b) because the wrongful demotion claim is tortious.

22. The cause of action for defamation does not appear to be intertwined with the causes of action for wrongful demotion, termination and breach of contract. In addition, the joint claim for loss of consortium may have derived from a wrongful demotion, termination, breach of contract and/or defamation. Because Ms. Foster failed to exhaust her contractual remedies as to wrongful demotion, termination and breach of contract, there can be no new trial on those claims. There may be a new trial for defamation or a claim for loss of consortium, stemming from the defamation. As such, Ms. Foster is not precluded from proceeding solely on those counts if the Court of Special Appeals grants her an entirely new trial, or a new trial only as to damages.

agreement. The agreement defines "grievance" as "a claim by one party that the other party has violated th[e] Agreement." The purpose of the agreement is "to secure, at the lowest possible administrative level, equitable solutions to the problems which may occur in the administration of th[e] Agreement." [23]

The agreement explains that "[a] suspension, demotion, discharge or other disciplinary action may only be taken against unit members for proper cause." It states, thereafter, that "[n]o grievance shall be initiated more than fifteen (15) duty days after the cause has occurred or should have been discovered." In addition,

> [a] grievance shall be automatically waived and shall not be subject to further discussion or appeal if the grievant does not process it within any of the stated time limits. Such time limits may only be extended by mutual agreement between the parties.

The agreement then explains that "[a] covered unit member will first discuss his/her grievance with his/her immediate supervisor. Both parties will make efforts to solve the grievance at this informal level." The agreement then outlines the four-step procedure. Under the heading, **"Step One,"** it states:

> If the grievance cannot be solved at the informal level, the unit member then submits the grievance to his/her appropriate administrator in writing within fifteen (15) duty days after the grievance arises. If the appropriate administrator does not satisfy it within ten (10) duty days from receipt of

---

**23.** The agreement further explains that suspension, demotion and discharge will be handled in accordance with the procedures of Section C, which states, in pertinent part:

> Written notice of charges with specifications will be given to the affected unit member at the time the disciplinary action is taken. Prior to acting upon a recommendation for discharge or suspension in excess of five (5) duty days, the deciding official shall offer the affected employee the opportunity to make a statement in his/her behalf personally or in writing.

the written grievance, the grievance may be processed to Step Two.

Under the heading, **"Step Two,"** the agreement continues:

If the grievant is not satisfied with the disposition in Step One, he/she may file his/her grievance in writing to the MCCSSE within five (5) duty days. The MCCSSE, within five (5) duty days from such filing, shall meet and counsel the grievant on the merits of the grievance and if the Union deems it to be meritorious, forward the grievance to the deputy superintendent or appropriate associate superintendent. If the grievance is referred within the time limits, the deputy superintendent or appropriate associate superintendent shall have five (5) duty days to respond to the grievant.

**"Step Three,"** further adds, in pertinent part:

1. If the grievant is not satisfied with the disposition in Step Two, he/she may again file his/her grievance in writing with the MCCSSE within five (5) duty days. Within five (5) duty days from such filing, the Union shall meet and counsel the grievant and if the Union deems it to be meritorious, forward the grievance to the superintendent. If the grievance is referred within the time limits, the superintendent shall have ten (10) duty days to respond to the grievant.

Of most importance to this case, **"Step Four–Arbitration,"** explains, in pertinent part:

1. If the grievant is not satisfied with the disposition of the grievance made by the superintendent, he/she may file it in writing with the MCCSSE within five (5) duty days for the Union's decision on whether or not the grievance shall be submitted to arbitration.

2. Arbitration may be initiated by the grieving party by serving notice upon the other party requesting arbitration within fifteen (15) duty days.... The receiving party will acknowledge his/her agreement with the submission to arbitration statement by affixing his/her signature to the submission form within five (5) duty days and returning the form to the grieving party....

3. The grieving party may submit the matter to arbitration within five (5) duty days of the return of the submission statement form. The superintendent and the president of MCCSSE will attempt to agree upon a mutually acceptable arbitrator and obtain a commitment from said arbitrator to serve.

\*  \*  \*  \*  \*  \*

Petitioners argue that the Board, even though it was subject to this collective bargaining agreement, was under no obligation to arbitrate Ms. Foster's grievances for wrongful demotion, termination and breach of contract after she withdrew her initial request for arbitration and her request to revive the arbitration was not timely. They explain that, while Ms. Foster properly filed her grievance and invoked her right to arbitration under the agreement, she then voluntarily withdrew her arbitration request. Petitioners contend that, in so doing, Ms. Foster waived her right to continue with the grievance process provided by the collective bargaining agreement because the Board closed the grievance.

Petitioners note that the Circuit Court recognized that Ms. Foster had failed to exhaust her contractual remedies and therefore stayed the counts for wrongful demotion and termination and breach of contract. They contend, however, that the Circuit Court failed to realize that Ms. Foster was no longer able to arbitrate her claims under the collective bargaining agreement because she had already waived her right to continue with the contractual grievance process. Furthermore, according to Petitioners, because of the waiver, Ms. Foster could no longer proceed with arbitration under the time requirements set forth in the collective bargaining contract. They aver that the Circuit Court erred when it permitted Ms. Foster's wrongful demotion claim to be decided by the jury, and the Court of Special Appeals erred in remanding the case to the Circuit Court on the issue of whether the Board had waived its right to arbitrate. Petitioners rely primarily on *Arroyo v. Bd. of Educ. of Howard County,* 381 Md. 646, 661, 851 A.2d 576, 585 (2004), and *Jenkins v. Wm. Schluder-berg–T.J. Kurdle Co.,* 217 Md. 556, 561–62, 144 A.2d 88, 91

(19586), for the proposition that a plaintiff must exhaust all available remedies before pursuing relief in court.

Respondents counter that there exists nothing in the collective bargaining agreement that mandates that an employee avail himself or herself of the grievance procedure and furthermore that Step Four provides that arbitration is optional, not mandatory. They contend that Ms. Foster did not have to follow through with arbitration because the collective bargaining agreement states explicitly that "[i]f the grievant is not satisfied with the disposition of the grievance made by the superintendent, he/she *may* file it in writing...." (Emphasis added). They assert that if Ms. Foster was required to submit her claim to arbitration, the agreement would instead use the word "must."

Respondents also argue that *Arroyo* is not dispositive because *Arroyo* dealt with statutory administrative remedies and not remedies under a collective bargaining agreement. They posit that Maryland law establishes that a plaintiff is not required to exhaust remedies available under a grievance procedure contained in a collective bargaining agreement in order to pursue a wrongful demotion or termination claim against an employer, citing *Finch v. Holladay–Tyler Printing, Inc.*, 322 Md. 197, 586 A.2d 1275 (1991). In addition, Respondents contend that the Court of Special Appeals erred in failing to conclude that the Board waived its right to arbitrate when the Board refused to arbitrate Ms. Foster's claim and after the Circuit Court stayed the wrongful demotion and termination and breach of contract claims.

### *Exhaustion of Contractual Remedies under the Collective Bargaining Agreement*

█ We agree with Petitioners' position and hold that when Ms. Foster waived arbitration, an integral part of the grievance process, she abandoned her claims for wrongful demotion, termination and breach of contract [24] and therefore aban-

---

24. Ms. Foster did not need to submit to arbitration her claims for defamation and loss of consortium because they were not covered by the collective bargaining agreement.

doned and failed to exhaust all of the contractual remedies provided for in the collective bargaining agreement. Once the Board refused to revive the arbitration proceedings, as it was entitled to do, the Circuit Court was obliged to dismiss the claims. Therefore, the Circuit Court erred in denying Ms. Gazunis and the Board's motion for summary judgment on those claims and in granting the Fosters' motion to consolidate those claims for trial.

This Court outlined the rules governing the processing of grievances under collective bargaining agreements in *Jenkins,* 217 Md. at 561–62, 144 A.2d at 91. We said:

The general rule is that before an individual employee can maintain a suit, he [or she] must show that he [or she] has exhausted his [or her] contractual remedies:

"This rule, which is analogous to the rule requiring the exhaustion of administrative remedies as a condition precedent to resorting to courts ... is based on a practical approach to the myriad problems, complaints and grievances that arise under a collective bargaining agreement. It makes possible the settlement of such matters by a simple, expeditious and inexpensive procedure, and by persons who, generally, are intimately familiar therewith.... The use of these internal remedies for the adjustment of grievances is designed not only to promote settlement thereof but also to foster more harmonious employee-employer relations." *Cone v. Union Oil Co.,* 129 Cal.App.2d 558, 564, 277 P.2d 464, 468 (1954).

Thus, if the employee refuses to take even the initial step of requesting the processing of the grievance, he [or she] will not be granted relief in the courts.

In that case, Jenkins brought a grievance against her employer for wrongful discharge. *Jenkins,* 217 Md. at 558, 144 A.2d at 89. She requested that the union send her claim to arbitration but it refused to do so. We explained that

arbitration is an integral part of the system of self-government. And the system is designed to aid management in its quest for efficiency, to assist union leadership in its partic-

ipation in the enterprise, and to secure justice for the employees. It is a means of making collective bargaining work.... When it works fairly well, it does not need the sanction of the law of contracts or the law of arbitration. It is only when the system breaks down completely that the courts' aid in these respects is invoked.

*Jenkins,* 217 Md. at 563–64, 144 A.2d at 92 (citations omitted). Even though Jenkins had not exhausted all of her contractual remedies, we held that she was not barred from suing her employer for wrongful discharge because she tried to exhaust her remedies and the union acted arbitrarily and in a discriminatory manner in refusing to send her grievance to arbitration. *Jenkins,* 217 Md. at 575–76, 144 A.2d at 99.

In addition, in *DelCostello v. Int'l Broth. of Teamsters,* 462 U.S. 151, 163, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476, 488 (1983), the Supreme Court explained that "[i]t has long been established that an individual employee may bring suit against his [or her] employer for breach of a collective-bargaining agreement.... Ordinarily, however, an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective-bargaining agreement." The Court went on to explain that only when the union representing the employee acts in a "discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation," may the employee bring his or her claim to court "notwithstanding the outcome or finality of the grievance or arbitration proceeding." *DelCostello,* 462 U.S. at 164, 103 S.Ct. at 2290, 76 L.Ed.2d at 488; *see also Dearden v. Liberty Medical Center, Inc.,* 75 Md.App. 528, 531, 542 A.2d 383, 385 (1988) (holding that an employee cannot maintain a suit against an employer without first showing that he or she has exhausted the available contractual remedies).

Respondents contend that *Finch,* 322 Md. 197, 586 A.2d 1275 (1991), overruled *Jenkins,* and that, therefore, Ms. Foster did not have to exhaust her remedies before proceeding with the claims, that were subject to the collective bargaining agreement, in court. We disagree. Instead, we interpret *Finch* as standing for the proposition that the exhaustion of

remedies under a collective bargaining agreement is not required when the issues raised by the plaintiff's wrongful discharge claim are not dependent upon an interpretation of the collective bargaining agreement. In *Finch,* an employee filed a workers' compensation claim due to a workplace injury that required him to miss four months of work. *Finch,* 322 Md. at 198, 586 A.2d at 1276. When he returned to work, he learned that he was one of several workers who was slated to be laid off. Although Finch was covered by a collective bargaining agreement, he chose not to initiate a grievance pursuant to the agreement but instead filed an action for retaliatory discharge and loss of consortium. Finch claimed that his employer used a layoff procedure as a pretext for firing him in retaliation for filing a workers' compensation claim. *Finch,* 322 Md. at 199, 586 A.2d at 1276. The employer argued that the case should be dismissed because Finch failed to exhaust his contractual remedies before proceeding in court. We held that

> there [wa]s no need to resort to arbitration because the issue addressed by arbitration, whether the layoff procedure was accomplished in conformity with the CBA, would not itself be determinative of the wrongful discharge claim.

*Finch,* 322 Md. at 207, 586 A.2d at 1280.

In the instant case, the collective bargaining agreement directly governs Ms. Foster's grievances pertaining to wrongful demotion, termination and breach of contract. The collective bargaining agreement states explicitly that "[a] suspension, demotion, discharge or other disciplinary action may only be taken against unit members for proper cause," and then outlines the procedures for filing a grievance, defined as "a claim by one party that the other party has violated th[e] Agreement." Ms. Foster's argument that she was wrongfully demoted and terminated under the agreement and that the Board breached the agreement is exactly what the collective bargaining agreement was designed to cover; as a result, *Finch* does not apply.

Respondents also contend that the reasoning of *Jenkins* does not apply because Ms. Foster's collective bargaining agreement explained that the procedure was optional based on its use of the word "may." We believe that Respondents' interpretation of the meaning of the word "may" in the collective bargaining agreement is incorrect. The ordinary meaning of the word "may" is "[t]o be allowed or permitted to," whereas the ordinary definition of the word "must" is "[t]o be required or obliged by law, morality, or custom." Webster's II New College Dictionary 693, 740 (3d ed.2005). In accordance with these definitions, Respondents are correct— Ms. Foster did not have to complete all four steps of the procedure—she had the option of stopping the grievance process at any point. By stopping the grievance process midstream, however, Ms. Foster waived her right to adjudicate her grievance with the Circuit Court, because, as explained *supra*, a plaintiff must exhaust all contractual remedies as a condition precedent to seeking judicial relief in the courts. To be certain, she did not have to continue with the grievance procedure if she no longer wanted to have her grievance heard; however, if she wanted to proceed with her grievance, she had to first exhaust her remedies under the collective bargaining agreement.

In addition, we agree with Petitioners that the Court of Special Appeals erred in remanding the case to the Circuit Court to determine whether the Board waived its right to arbitrate the claims. In our view, the Board was absolved of its obligation to arbitrate Ms. Foster's grievance when she waived Step Four of the collective bargaining agreement, the arbitration step. The grievance procedure is in place to aid the grievant, in this case, Ms. Foster, to seek informal resolution of her complaints. Once Ms. Foster waived arbitration, the Board was entitled to close the grievance, and, therefore, the Board had no obligation to convince Ms. Foster to continue. The collective bargaining agreement sets forth specific time limits and states explicitly that "[a] grievance shall be automatically waived and shall not be subject to further discussion or appeal if the grievant does not process it within

any of the stated time limits." When Ms. Foster attempted to revive her arbitration after she had waived it, she was acting beyond the stated time limit of five days.[25] The agreement states clearly that the time limits "may only be extended by mutual agreement between the parties," and the Board was under no obligation to extend those time limits. We therefore see no need for the Circuit Court to decide whether the Board waived its right to arbitration because it is clear that the Board, in fact, did not waive arbitration.

We hold that the Circuit Court erred in allowing the jury to adjudicate the claims for wrongful demotion, termination and breach of contract because Ms. Foster failed to exhaust her contractual remedies provided for in the collective bargaining agreement.

## CONCLUSION

Based on our holding that, by abandoning her demand for arbitration, Ms. Foster failed to exhaust her contractual remedies and therefore had no right to pursue her claims for wrongful demotion, termination, breach of contract and her and her husband's derivative claim for loss of consortium, against the Board in court; the judgment entered against the Board, based on those claims must be reversed. There can be no new trial on those claims. We cannot resolve the status of the judgment against Ms. Gazunis based on the claim for defamation and/or any portion of the claim for loss of consortium stemming from the defamation. At the very least, because of the way in which the issue of damages was presented to the jury, a new trial on damages with respect to those claims must be held. It is simply not possible to determine from the verdict sheet or from the record as a whole whether the unitary award of $285,000 was intended to apply to the defamation count or which portion of the loss of consortium

---

**25.** The record does not specify the exact date upon which Ms. Foster attempted to "revive" arbitration, however, it does explain that she did so more than two weeks after she filed her initial complaint, which was after she withdrew her request for arbitration with the Board.

verdict was attributable to defamation or wrongful demotion. As we observed, several issues were properly raised in the Court of Special Appeals. The validity of the verdict as to liability in the defamation action and the validity of the judgment entered against the Board, as well as the propriety of the trial judge's decision absolving Ms. Gazunis from liability are matters that the intermediate court declined to address. In light of our holding with respect to the claims against the Board, the Court of Special Appeals must now address those issues. The status of the defamation claim will necessarily depend on how those issues are resolved. If the intermediate appellate court were to conclude that any of those issues have merit and would warrant a new trial on the defamation count, and the derivative claim for loss of consortium, it will have to reverse the judgment entered against Ms. Gazunis and remand for a new trial on those counts. If the Court of Special Appeals were to conclude that none of the issues have merit or would not, in any event, require an entirely new trial, it should reverse the judgment against M s. Gazunis and remand for a new trial only on damages.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENTS.**